J-S03001-25 & J-S03002-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: B.W., A/K/A B.S.W, III, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 726 WDA 2024 |

Appeal from the Order Entered May 21, 2024
In the Court of Common Pleas of Washington County Orphans' Court at
No(s): 63-22-0845

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 727 WDA 2024 |

Appeal from the Order Entered May 21, 2024
In the Court of Common Pleas of Washington County Orphans' Court at
No(s): 63-22-0844

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 973 WDA 2024 |

Appeal from the Order Dated July 12, 2024
In the Court of Common Pleas of Washington County Orphans' Court at
No(s): 63-22-0844

| | | |
|---|---|---|
| IN RE: ADOPTION OF: B.W., A/K/A B.S.W. III., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.W., MOTHER | : : : : : : : | |
| | : | No. 974 WDA 2024 |

Appeal from the Order Dated July 12, 2024
In the Court of Common Pleas of Washington County Orphans' Court at
No(s):  63-22-0845

BEFORE:  KUNSELMAN, J., SULLIVAN, J., and BECK, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED: April 4, 2025**

B.W. (Father) and R.W. (Mother) (collectively, Parents) appeal from the orders entered on May 21 and July 12, 2024, respectively, which involuntarily terminated their parental rights to their biological sons, B.W. a/k/a B.S.W. III (B.W.), born in December 2013, and M.W., born in June 2016 (collectively, the Children).[1]  After careful review, we affirm.

We gather the relevant factual and procedural history of these matters from the certified record.  Although Parents never married, they were in a long-term relationship for approximately eight years before separating in 2020, shortly before this controversy arose.  **See** Motion to Supplement the Record, 4/26/24, at Exhibit 1 at 5.  Parents have a total of three children

---

[1]  Since Parents have raised similar claims concerning the same factual and procedural events, we have consolidated these cases sua sponte pursuant to Pa.R.A.P. 513 ("Where there is more than one appeal from the same order, or where the same question is involved in two or more appeals in different cases, the appellate court may, in its discretion, order them to be argued together in all particulars as if but a single appeal.").

together.[2] Mother has nine children with at least two different fathers, and we discern that she had a prior history of involvement with Washington County Children and Youth Services (CYS or the Agency).

The Children first came to the attention of CYS on July 13, 2020, when B.W. was six years old and M.W. was approximately four years old. Specifically, CYS received reports indicating that Parents were beating the Children. *See* N.T., 3/14/24, at 15-18; Order of Adjudication and Disposition, 8/11/20, at 6. The Agency also received reports that Parents were abusing alcohol and marijuana in the home. *See* N.T., 3/14/24, at 19-20. Finally, concerns were also raised regarding Parents' history of intimate partner violence (IPV). *See id.* at 20. At the time CYS received these reports, Parents had separated, and the Children were residing solely with Father in a hotel located near Pittsburgh, Pennsylvania. *See id.*

The same day it received these reports, the Agency sought and was granted emergency protective custody of the Children. *See Id.* at 18. The Children underwent forensic examinations at Children's Hospital, wherein they independently disclosed physical abuse. *See id.* at 21. The exam also revealed scars on the Children's bodies that were consistent with abuse. *See id.* at 21-22. Subsequent investigations also revealed that Father had engaged in "adult sexual activity" while B.W. was "in the bed next to him." *See* N.T., 4/8/24, at 28. Additionally, Father was found to be "indicated as a

---

[2] Although there are few references in the certified record, we discern the Children have a younger sister, R.W., who is not implicated by these cases.

perpetrator of [sexual] abuse with the victim being [the Children's] maternal half[-]sibling." Orphans' Court Opinion, 7/5/24, at 7.

On July 24, 2020, the court filed a shelter care order and confirmed the Children's removal. On August 11, 2020, the court adjudicated the Children dependent based upon "inappropriate discipline, parental substance abuse while in a caregiving role, domestic violence and a lack of stable housing." Order of Adjudication and Disposition, 8/11/20, at 3. The Children's initial permanency goal was established as reunification with Parents.

In furtherance of the reunification goal, the court ordered Parents to, *inter alia*, "maintain a clear and sober lifestyle," submit to random drug screenings, successfully complete IPV counseling, and participate in mental health treatment. **See** Order of Adjudication and Disposition, 8/11/20, at 4-5; N.T., 3/14/24, at 28-29. Parents were, initially, afforded "liberal supervised visitation" with the Children. **See id.** at 4.

Between August 2020 and January 2024, the trial court held regular permanency review hearings regarding Parents' compliance and progress. **See** N.T., 3/14/24, at 29-63. During this time period, Parents' compliance with their permanency objectives ranged from moderate to minimal but their overall progress was minimal. **See id.**; **see also** N.T., 4/8/24, at 112-14.

Although Parents regularly participated in visits with the Children throughout these proceedings, the frequency of these interactions was immediately reduced to "two times per week for two hours" in August 2020. **See** N.T., 3/14/24, at 43, 65-67. Father's visits were eventually decreased to

once every other week for two hours.  *See* N.T., 4/8/24, at 112.  Parents never progressed to unsupervised interactions with the Children.

From July 2020 through May 2021, the Children were placed in a succession of kinship and foster homes that were unsuitable.  *See* N.T., 3/14/24, at 22-25.  Beginning in May 2021, the Children were placed in the care of C.C. (Foster Father) in Brownsville, Pennsylvania.  Between May 2021 and December 2022, the Children thrived in Foster Father's care.  In December 2022, however, the Children were removed from Foster Father's custody at his request due to professional "difficulties" that required him to relocate to West Virginia.  *See id.* at 25.  He also expressed doubts as to his ability to provide for the Children's emotional needs.  *See* N.T., 4/5/24, at 47.

Thereafter, the Children returned to another series of unsuccessful kinship and foster placements between December 2022 and July 2023.  *See id.* at 25-27.  Contemporaneously, B.W. began exhibiting "sexually acting out behaviors" targeting M.W. and it became a "safety threat" to keep the Children in the same placement.  *See id.* at 26.  B.W. also had a "long history of inappropriate sexual touching at multiple foster homes."  N.T., 4/8/24, at 27-28.  He was committed to Southwood Psychiatric Hospital from April 2023 through July 2023 for "sexually maladaptive behaviors."  N.T., 3/14/24, at 26.  Of note, B.W. was diagnosed with attention deficit hyperactivity disorder, post-traumatic stress disorder (PTSD), and generalized anxiety disorder.  *See* N.T., 4/8/24, at 116.  M.W. has no relevant mental health diagnoses.

Upon his release from Southwood in July 2023 B.W. was returned to Foster Father's care in West Virginia. *See* N.T., 4/5/24, at 37. Foster Father had reached out to the Agency and offered to be a resource for the Children again, since he was more settled. *See* N.T., 3/14/24, at 27. In January 2024, M.W. was similarly returned to the Foster Father's custody with a safety plan in place to address the prior inappropriate contact between the Children. *See* N.T., 4/5/24, at 37-38, 42-45. At the time of the termination hearings, Foster Father was identified as a pre-adoptive resource. *See* N.T., 3/14/24, at 27-28.

On May 25, 2022, the Agency filed petitions to involuntarily terminate Parent's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[3] Thereafter, the orphans' court entered a number of continuances that resulted in the proceedings being delayed for approximately two years. Ultimately, the orphans' court held termination hearings on March 14, April 5, and April 8, 2024, at which time B.W. was ten years old and M.W. was seven years old. The court heard extensive testimony from Foster Father; CYS caseworker Julie Bower; the Children's court-appointed special advocate

_____

[3] The orphans' court appointed Benita Thompson, Esquire, to act as the Children's guardian *ad litem*. Separately, the orphans' court appointed Erin Dickerson, Esquire, to serve as legal interest counsel for B.W. and Jessica Johnson, Esquire, to serve as legal interest counsel for M.W. Accordingly, we discern no structural error pursuant to 23 Pa.C.S.A. § 2313(a). *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) ("[A]ppellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with [Section] 2313(a).").

Linus Mayernik ("CASA"); Dr. Terry O'Hara and Dr. Neil D. Rosenblum, who conducted interactional assessments of Parents, the Children, and Foster Father; and Carol Hughes, a psychologist who treated Father in connection with his being indicated as a sexual abuser. Father appeared telephonically, but did not testify.[4] Mother was present and testified. She also adduced character testimony from several friends and family members.

On May 14, 2024, the orphans' court filed orders that purported to permit Mother to voluntarily relinquish her parental rights to the Children, which appears to have been a clerical error. On May 21, 2024, the orphans' court filed separate orders that granted the Agency's petitions and involuntarily terminated Father's parental rights to the Children. On June 13, 2024, Father filed timely notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). On July 12, 2024, the orphans' court filed an amended order that granted the Agency's petitions and involuntarily terminated Mother's parental rights.[5] On August

---

[4] Father voluntarily left the April 8, 2024 hearing and communicated through his lawyer that he refused to listen to the alleged "lies" of the Agency's witnesses. *See* N.T., 4/8/24, at 104-06.

[5] Pursuant to 42 Pa.C.S.A. § 5505, "a court upon notice to the parties may modify or rescind any order within 30 days after its entry, . . . if no appeal from such order has been taken or allowed." However, "patent and obvious mistakes" in an order may be modified beyond this thirty-day modification period, so long as the purported error qualifies as a "clear clerical error." *Commonwealth v. Ellsworth*, 97 A.3d 1255, 1257 (Pa. Super. 2014). Our review of the certified record reveals no indication that Mother ever pursued voluntary relinquishment of her parental rights. Furthermore, the involuntary
*(Footnote Continued Next Page)*

12, 2024, Mother filed timely notices of appeal and Rule 1925(a)(2)(i) statements.[6/7] Thereafter, the orphans' court authored separate responsive Rule 1925(a)(2)(ii) opinions that explained its rationale for terminating Parents' respective parental rights.

_____

character of these termination proceedings is clear from the face of the certified record. Under these facts, we observe no error or abuse of discretion in the orphans' court's correction of a patent mistake. ***See id***.

[6] The last day of Mother's time in which to file an appeal with respect to the orphans' court's amended order technically fell on August 11, 2024, which was a Sunday. ***See*** Pa.R.A.P. 903(a). Therefore, that day was properly excluded from the timeliness computation pursuant to 1 Pa.C.S.A. § 1908. Thus, Mother's notice of appeal and concise statement were filed timely.

[7] Mother did not file a notice of appeal with respect to the trial court's May 14, 2024 order. Pa.R.A.P. 903(a) provides that litigants have thirty days from the "entry" of an order to timely file a notice of appeal. An order entered in a matter governed by the Pennsylvania Rules of Orphans' Court Procedure is deemed entered on the "date on which the clerk makes the notation in the docket that written notice of entry of the order has been given as required by Pa.R.O.C.P. 4.6." Pa.R.A.P. 108(c). Pursuant to Rule 4.6(b), the clerk is required to "note in the docket the date when notice was given to the interested party or to his or her counsel[.]" Pa.R.O.C.P. 4.6(b). No such notation appears on the dockets of either 973 WDA 2024 or 974 WDA 2024. Accordingly, we observe no impediment to our appellate jurisdiction. ***See In re K.P.***, 872 A.2d 1227, 1230 (Pa. Super. 2005).

Furthermore, we also note that Mother requested leave to file a notice of appeal *nunc pro tunc* with respect to the May 14, 2024 order, which the trial court granted on July 11, 2024. ***See*** Order, 7/11/24. One day later, however, the trial court filed an amended order that corrected the clerical error in the original order. ***See*** Amended Order, 7/12/24, at 1-2. Accordingly, Mother did not file a notice of appeal *nunc pro tunc* as to the May 14, 2024 order but properly appealed the amended order as detailed above. ***See***, ***e.g.***, ***Martin v. Gerner***, 481 A.2d 903, 905 (Pa. Super. 1984) (holding that the date an interlocutory order was amended to include an appealable issue constituted the date the thirty-day time period of Rule 903(a) began to run irrespective of the fact that the original order was entered more than thirty days earlier).

In their briefs, Parents have challenged the sufficiency of the evidence to sustain the orphans' court's involuntary termination of their parental rights pursuant to Section 2511(a) and (b).[8] **See** Mother's Brief at 10-21; Father's Brief at 13-28. We will address their claims, in turn.

Our standard of review in this context is well-established:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

> In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

---

[8] The Children's guardian *ad litem* filed briefs on the Children's behalf advocating in favor of affirming the orphans' court's termination orders.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa.Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. ***Id.*** at 830; ***see also*** 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). It is well-established that this Court need only agree with the court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Based upon the following reasoning and analysis, we conclude that the record supports the orphans' court's conclusion that the Agency met its burden of proof under Section 2511(a)(2) and (b), which provide, in relevant part, as follows:[9]

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following

---

[9] By analyzing Section 2511(a)(2), we render no conclusions as to the validity of the orphans' court's findings under Section 2511(a)(1), (5), or (8). ***See In re K.R.***, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*) (observing this Court may proceed to a review of one subsection of Section 2511(a) "[w]ithout considering the orphans' court's determinations" under any other subsection).

grounds:

. . . .

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(a)(2), (b).

In order to satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa.Super. 2021). Grounds for termination pursuant to Section 2511(a)(2) "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010)). In sum, "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443.

In its Rule 1925(a) opinions, the trial court found that the involuntary termination of Parents' parental rights was warranted pursuant to Section 2511(a)(2). *See* Orphans' Court Opinion, 7/5/24, at 21-23; Orphans' Court Opinion, 9/9/24, at 25-30. Specifically, the orphans' court found that Father "evidenced a refusal to perform parental duties" and "chose to not participate in services that would provide him with the necessary tools to provide [the Children] with love[,] protection, guidance[,] and support." Orphans' Court Opinion, 7/5/24, at 21. With respect to Mother, the court found her "pattern of inconsistency" and "declining behavior" throughout these proceedings caused the Children to "be without essential parental care, control or subsistence[.]" Orphans' Court Opinion, 9/9/24, at 30. The orphans' court also determined that Parents could not, or would not, remedy their respective refusals and incapacities.

Our review of the certified record reveals ample support for the orphans' court's findings pursuant to Section 2511(a)(2). With respect to the first element of Section 2511(a)(2), Parents suffer from evident parental incapacities. Initially, we note that Parents have significant mental health issues. Specifically, Dr. O'Hara testified that Mother has been diagnosed with, *inter alia*, bipolar disorder, generalized anxiety disorder, alcohol use disorder, and stimulant use disorder. *See* N.T., 4/8/24, at 32. Father has been diagnosed with depressive disorder, generalized anxiety disorder, PTSD, intermittent explosive disorder, and alcohol use disorder. *See id.* at 36-37.

Ms. Bower testified that Parents also struggled with substance abuse throughout these cases. *See* N.T., 3/14/24, at 19-20. She averred that Parents admitted to abusing marijuana in front of the Children prior to their removal. *See id.* Ms. Bower indicated Parents had failed to regularly appear for their court-ordered drug screens. *See id.* at 30; N.T., 4/8/24, at 103. When Parents did comply with their screening obligations, they regularly tested positive for marijuana, cocaine, and alcohol.[10] *See* N.T., 3/14/24, at 30-60; N.T., 4/8/24, at 10, 103-04.

Furthermore, the certified record indicates that Father engaged in improper sexualized behavior that negatively impacted his parental care of the Children. Specifically, Dr. O'Hara testified that Father engaged in "adult sexual activity" while B.W. was sleeping "in the bed next to him." *See* N.T., 4/8/24, at 11, 28. Dr. O'Hara's testimony also indicated that B.W. specifically disclosed that Father was "having sex in the bed right next to him with men and women." *Id.* at 28. Finally, Ms. Hughes' testimony confirmed that Father

_____

[10] Parents claimed to possess valid medical marijuana cards. Ms. Bower testified that Father never produced any such documentation to that effect. *See* N.T., 4/8/24, at 150-52. The certified record indicates that Mother had a valid medical marijuana card from July 6, 2020, until it expired in November 2022. *See* N.T., 3/14/24, at 31; N.T., 4/8/24, at 151-53. Thereafter, Mother tested positive for marijuana on numerous occasions between December 2022 and March 2024. *See* N.T., 3/14/24, at 59-64; N.T., 4/8/24, at 163. During this same time period, the certified record reflects that Mother also missed more than one dozen scheduled drug screens. *See* N.T., 3/14/24, at 59-64.

was found to be indicated as a perpetrator of sexual abuse against one of the Children's half-siblings. *See id.* at 79.

Additionally, the certified record fully supports the trial court's conclusion that Parents' incapacities caused the Children to be without essential parental care, control, and subsistence, *i.e.*, the second inquiry pursuant to Section 2511(a)(2). Of particular note, Dr. O'Hara prepared an interactional report in September 2023 and testified that the Children "sustained physical and emotional abuse" at the hands of Parents, while concomitantly being exposed to significant IPV and inappropriate sexualized behavior. *See* N.T., 4/8/24, at 11. Dr. O'Hara averred that these "adverse childhood experiences" placed the Children at increased risk "for a variety of mental health issues, delinquent activities, school-related concerns, substance abuse, even increased risk for medical issues." *Id.* at 12. Dr. Rosenblum similarly testified that the Children suffered from "socialization issues" related to Parents' incapacities. *See id.* at 51. Dr. Rosenblum characterized Parents' care of the Children as neglectful and "maltreatment." *See id.* at 66.

Finally, the evidence of record corroborates the trial court's finding with respect to the third element of Section 2511(a)(2), namely, that the causes of Parents' incapacities cannot, or will not, be remedied. As noted above, Ms. Bowers testified extensively that Parents' compliance and overall progress was consistently found to be minimal despite nearly four years of court-ordered services. *See* N.T., 3/14/24, at 29-63; N.T., 4/8/24, at 112-14. At the time

of his assessment of Parents in September 2023, Dr. O'Hara opined that there was "no evidence" that they had "sufficiently addressed" their mental health, IPV, or substance abuse issues. N.T., 4/8/24, at 11-12.

While Parents complied with some aspects of their court-ordered services by enrolling in mental health services and completing IPV counseling, Dr. Rosenblum explained that Parents lack of progress was largely grounded in their refusal to even acknowledge the issues that led to the Children's removal. *See* N.T., 4/8/24, at 66 ("[T]here was not only a lack of progress, but there was a lack of acknowledgment of the problems that [led] to the boys' removal in the first place."). Along similar lines, Dr. O'Hara related that Mother had expressed her belief that the Children had "no developmental needs" at all. N.T., 4/8/24, at 18. He testified that Mother has generally refused to take responsibility for any of the problems affecting the Children, while broadly characterizing the allegations against her and Father as unfounded "lies" concocted by the Agency and other service providers. *See id.* at 34-36. Ms. Hughes testified that Father also took no responsibility for the Children's removal from his care.[11] *See id.* at 92-93. Indeed, she testified

_____

[11] In her testimony, Mother claimed that she accepted responsibility for the issues that led to the Children's removal: "I accept responsibility for everything that has gone on in this, throughout this whole thing. But to me, it's no one's business but my own, and my therapist's about my acknowledgement and my responsibility in this case." N.T., 4/8/24, at 173. In her testimony, however, Mother also continued to disclaim any obligation to communicate openly with the Agency or her service providers. *See id.* We
*(Footnote Continued Next Page)*

Father's sex offender treatment was unsuccessful due to his refusal to acknowledge his wrongful actions. **See id.** at 73-74.

Based upon the foregoing, we observe no abuse of discretion or error of law in the orphans' court's holding that the termination of Parents' parental rights was warranted pursuant to Section 2511(a)(2).

Since the record supports the orphans' court's conclusion that adequate grounds for termination existed pursuant to at least one subsection of Section 2511(a), we now turn to a review of the court's findings pursuant to Section 2511(b), which gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b); **see also T.S.M.**, 71 A.3d at 267. We remain mindful that "the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," with an eye towards "each child's specific needs." **Interest of K.T.**, 296 A.3d 1085, 1105-06 (Pa. 2023). This inquiry is neither formulaic, nor mechanical. **See id.**

Our review must include consideration of the bond between the parent and the child. **See In re E.M.**, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has explained, however, that "only a necessary and beneficial" parental bond should be maintained. **K.T.**, 296 A.3d at 1009. A bond is considered to

_____

observe no abuse of discretion in the trial court's findings. **See In re Q.R.D.**, 214 A.3d 233, 239 (Pa. Super. 2019) ("The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence.").

be "necessary and beneficial" if its severance would cause extreme emotional consequences or significant, irreparable harm. *Id.* at 1109-10. The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (cleaned up). Therefore, it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." *M.E.*, 283 A.3d at 839 (cleaned up). Courts should also consider "whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *K.T.*, 296 A.3d at 1106. Finally, we note that a child's "emotional needs and welfare include intangibles, such as love, comfort, security, and stability." *Id.*

In its Rule 1925(a) opinions, the orphans' court found that the Agency met its burden with respect to Section 2511(b) as to Parents. *See* Orphans' Court Opinion, 7/5/24, at 26-29; Orphans' Court Opinion, 9/9/24, at 33-36. Specifically, the orphans' court found the Children's needs and welfare would be best served by terminating Parents' parental rights due to the Children's fear of Parents and close relationship with Foster Father. *See id.*

With respect to the mandated bond analysis, Ms. Bower acknowledged in her testimony that Parents "love" the Children and "want to be a part of their lives." N.T., 4/8/24, at 117-18. She emphasized, however, that those feelings are not reciprocated by the Children who "fear" being returned to Parents' care. *Id.* Of note, Ms. Bower testified that B.W. remained particularly

afraid and felt unsafe at the prospect of returning to Parents' custody and care in April 2024. *See id.* at 139-40. Even assuming, *arguendo*, Parents and the Children share some manner of beneficial bond, the certified record evinces that the Children's true parental bond lies with Foster Father. Dr. Rosenblum reported the Children were expressing their desire to be adopted by Foster Father as early as December 2022. *See* N.T., 4/8/24, at 61-62. Ms. Bower and the Children's CASA each testified that Children remained steadfast in their desire to stay with Foster Father at the time of the termination hearing. *See id.* at 139-40, 143-44; *see also* N.T., 4/5/24, at 27-28, 33-34.

Furthermore, Dr. Rosenblum testified that the Children did "exceptionally well" during their first period of placement with Foster Father and the Children's "socialization issues" had shown "considerable improvement." N.T., 4/8/24, at 49-51. Dr. Rosenblum opined that Foster Father had "displayed a lot of talent, a lot of care and concern for the [Children]." *Id.* at 53. Dr. Rosenblum noted the Children "were very happy with [Foster Father], and felt very connected not only to him, but to the other members of his family. And their needs were definitely being met in terms of educational, mental health[,] and recreational activities." *Id.* at 54.

Dr. Rosenblum acknowledged that the Children's temporary removal from Foster Father's care was "a loss and disruption." N.T., 4/8/24, at 58. Ms. Bower explained, however, that Foster Father independently reached out to the Agency to discuss the possibility of resuming custody of the Children

immediately after B.W.'s release from Southwood. ***See*** N.T., 3/14/24, at 27. During these communications, Foster Father exhibited "remorse that he had to let the boys go" and stated "that his life was back in order again" and he was "willing to do whatever he could to still be a part" of the Children's lives. ***Id.*** Following the termination hearings, Dr. Rosenblum conducted follow-up psychological assessments of the Children and Foster Father in April 2024, which were properly entered into the certified record. These reports strongly corroborated that the Children were being well-cared for by Foster Father and advocated in favor of termination of Parents' parental rights.[12] ***See generally*** Motion to Supplement Record, 4/26/24, at Exhibit 1 (opining that the Children's adoption by Foster Father is "the absolute best decision" available).

With respect to B.W.'s struggle with sexualized behaviors, Ms. Bower testified that Foster Father has been "very good about enforcing" the safety plan and "helping the [C]hildren understand why . . . they can't spend time in each other's bedrooms; why they can't roughhouse with each other. And the [C]hildren have been respectful." N.T., 4/8/24, at 148. Thus, Ms. Bower

---

[12] Dr. Rosenblum also conducted interactional evaluations of Parents, the Children, and Foster Father in 2021 and 2022. ***See*** N.T., 4/8/24, at 48. Following his first evaluation of Parents in 2021, Dr. Rosenblum recommended that the Children should be adopted due to Parents' "very limited progress" and "limited insight into the difficulties which led to the [Children's] removal[.]" ***Id.*** at 53. He similarly concluded after a 2022 evaluation that "there was no value in continuing to look at the possibility of reunification of the [C]hildren with their parents." ***Id.*** at 67.

averred that she had "zero concerns" regarding the Children's well-being and safety in Foster Father's care. *Id.* at 149.

Overall, we discern no abuse of discretion or error of law in the orphans' court's findings pursuant to Section 2511(b), which are well-supported by the evidence. Thus, we affirm the underlying orders.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 4/4/2025